**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| **EMPIRE AUTO PROTECT, LLC,**<br><br>      Plaintiff,<br><br>v.<br><br>**JEFFREY H. KASS and DICKINSON WRIGHT PLLC,**<br><br>      Defendants. | <br><br>Case No. 4:25-cv-01787-JMD<br><br>JURY TRIAL DEMANDED |

**FIRST AMENDED COMPLAINT**

COMES NOW Plaintiff Empire Auto Protect, LLC ("Empire"), by and through its undersigned counsel, and for its First Amended Complaint against Defendants Jeffrey H. Kass ("Kass") and Dickinson Wright PLLC ("DW") (collectively, "Defendants"), states as follows, and demands on all issues so triable:

**INTRODUCTION**

1. Empire sells extended vehicle service contracts. It exists almost entirely online, and virtually all of its advertisements are online. Empire competes with CarShield, one of the largest and best-known sellers of vehicle service contracts.

2. This action arises from Defendants' representation of Empire in connection with advertising compliance and trademark-related issues and their subsequent representation of CarShield in a lawsuit directly adverse to Empire concerning the same subject matter.

3. From March 2023 through May 2025, Defendants served as Empire's legal counsel with respect to intellectual property and advertising compliance matters. On May 16, 2025, while Empire remained their client and without obtaining informed written consent from Empire,

Defendants filed a lawsuit against Empire in this Court on behalf of CarShield concerning the same advertising practices on which Defendants had advised Empire.

4.    Defendants did not obtain Empire's informed written consent to any concurrent conflict of interest prior to undertaking representation of CarShield in litigation directly adverse to Empire.

5.    During their representation of Empire, Defendants repeatedly represented to Empire that they would not represent CarShiseld in any dispute adverse to Empire. Despite those representations, Defendants later undertook representation of CarShield in litigation directly adverse to Empire involving the same advertising practices.

6.    The lawsuit filed by Defendants on behalf of CarShield alleged that Empire's advertising practices infringed CarShield's trademark rights and created consumer confusion.

7.    During their representation of Empire, Defendants reviewed Empire's advertising materials and were aware of the content and structure of those advertisements, including the use of Empire's own branding, logo, trade dress, and trademark ("Empire Auto Protect"). At all times relevant, Defendants had actual knowledge that Empire was not taking any steps to make potential customers believe that Empire was CarShield.

8.    If Empire's advertising practices were legally noncompliant or infringing, Defendants had a duty to advise Empire of the risks and provide competent guidance to avoid such exposure. If Empire's advertising practices were not legally infringing, then Defendants lacked a good-faith basis to file suit against Empire concerning those same practices. Regardless of the ultimate merits, Defendants owed Empire an independent and non-waivable duty of undivided loyalty and were prohibited from representing a directly adverse client in the same or a substantially related matter without obtaining Empire's informed written consent. Defendants'

undertaking of representation adverse to Empire concerning the same advertising practices they had reviewed and advised upon constituted a breach of that duty independent of the substantive merits of the underlying trademark dispute.

9.      As a direct and proximate result of Defendants' conduct, Empire has incurred and continues to incur damages, including: (a) legal fees paid to Defendants for advice relating to advertising compliance; (b) attorneys' fees and costs incurred in seeking Defendants' disqualification and withdrawal in the lawsuit filed by CarShield; (c) attorneys' fees and costs incurred in defending the lawsuit filed by CarShield; and (d) any amounts Empire is required to pay in settlement of, or as a result of a judgment entered in, the CarShield litigation, together with all related consequential damages.

## THE PARTIES

10.      Empire is a limited liability company organized under the laws of Delaware with its principal place of business in New Jersey.

11.      Defendant Kass is an attorney licensed to practice law in the State of Missouri who represented Empire and later appeared in this Court on behalf of CarShield in litigation against Empire. Upon information and belief, Kass resides in Denver, Colorado.

12.      Defendant DW is a professional limited liability company authorized to practice law in Missouri. DW represented Empire and later appeared in this Court on behalf of CarShield in litigation against Empire. Upon information and belief, DW's principal place of business is in Detroit, Michigan.

## JURISDICTION AND VENUE

13.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Empire and Defendants, and

the amount in controversy exceeds $75,000, exclusive of interest and costs.

14. Empire is a limited liability company. Each of its members is a citizen of the State of New Jersey. No member of Empire is a citizen of the State of Missouri.

15. Complete diversity exists between Empire and Defendants.

16. The amount in controversy exceeds $75,000 because Empire seeks recovery of defense costs, attorneys' fees, and other damages arising from Defendants' alleged malpractice and fiduciary breaches, which exceed the jurisdictional minimum.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Empire's claims occurred in this District.

18. Specifically, Defendants filed and litigated the underlying lawsuit in this District on behalf of CarShield against Empire (*NRRM, LLC v. Empire Auto Protect, LLC*, Case No. 4:25-cv-00716-SRW) (the "CarShield Action"), and the professional acts and omissions giving rise to this action are directly connected to that litigation.

19. Additionally, Defendants are subject to the jurisdiction of this Court because they are admitted to practice law in the State of Missouri and/or licensed to practice law in the State of Missouri, and appeared before this Court in connection with the underlying action that forms the basis of this malpractice claim.

## FACTS

### *Empire Retains Defendants for Specialized Trademark and Advertising Advice*

20. In March 2023, Empire retained Defendant Kass to provide legal advice concerning intellectual property and advertising compliance, including issues relating to digital marketing and keyword advertising.

21. At the time of Empire's retention of Kass, Kass was employed at Lewis Brisbois.

22.     In approximately April or May 2023, Kass joined DW and the attorney-client relationship with Empire continued uninterrupted through DW, as solidified by a formal engagement letter issued by Kass on behalf of DW on January 17, 2024.

23.     On January 17, 2024, Kass, on behalf of Dickinson Wright PLLC, issued a written engagement letter confirming that Dickinson Wright would represent Empire Auto Protect, LLC "in connection with the matters on Schedule A as well as additional matters from time to time," and that the firm would "do our best to ensure that you are provided with timely legal advice in connection with this matter and your business endeavors."

24.     Schedule A to the engagement letter identified, among the matters for which Defendants were retained, "Advertising Advice."

25.     The engagement's identification of "Advertising Advice" necessarily encompassed evaluation of trademark infringement risk, consumer confusion exposure, keyword bidding practices, and competitor enforcement posture in connection with Empire's online marketing activities.

26.     The engagement letter's reference to "additional matters from time to time" reflected an ongoing advisory relationship, not a discrete or isolated task. Empire reasonably understood Defendants to be its continuing advertising and trademark counsel for matters affecting its digital marketing operations.

27.     From March 2023 through May 2025, Defendants provided legal services to Empire concerning advertising compliance and potential exposure to trademark claims arising from Empire's online marketing activities.

28.   Throughout this period, Defendants represented to Empire that they possessed the requisite knowledge, experience, and skill to advise Empire regarding advertising compliance and potential trademark exposure.

***Defendants' Undisclosed and Concurrent Representation of CarShield***

29.   While advising Empire on how to avoid trademark litigation, Defendants were simultaneously representing CarShield, one of Empire's competitors.

30.   Upon information and belief, Kass represented CarShield during his tenure at Lewis Brisbois and continued that professional relationship thereafter.

31.   Public records reflect that Kass has represented CarShield since at least as early as April 2023, including in connection with trademark matters. Public records further reflect that Kass's prior firm, Lewis Brisbois, had represented CarShield for at least several years before Kass joined DW.

32.   Upon information and belief, Defendants represented CarShield in other legal matters during the same time period in which they were representing Empire, including during 2023, 2024, and 2025.

33.   On information and belief, at all relevant times, Defendant Kass's biography on the DW firm website prominently identified as the first "Prominent Assignment" that he "Represented CarShield obtaining preliminary injunction against largest competitor in case involving initial interest confusion related to keyword bidding on Google in trademark infringement case."

34.   Despite the clear potential for conflict in advising two competitors on trademark-sensitive marketing practices, Defendants failed to disclose the full extent of this relationship to Empire.

35.     Upon information and belief, Defendants continue to represent CarShield in legal matters to this day.

### *Defendants Subverted Empire's Interests to Benefit CarShield*

36.     While Defendants were retained to protect Empire from trademark exposure, they instead utilized their position to assist CarShield in building an adverse case against Empire. This conflict is evidenced by the following communications and events:

a.  Upon information and belief, in early 2024, while Defendants were actively representing Empire, CarShield complained to Kass that Empire's sponsored search advertisements were appearing in response to consumer searches for "CarShield" and were diverting consumers to Empire.

b.  On January 24, 2024, Kass informed Empire in writing that "a big client of mine" had observed Empire bidding on "CarShield" as a keyword and that such client "sue[s] everyone who ever does that." Kass explicitly acknowledged the conflict, further stating: "I can't represent either of you in a dispute but I asked them to hold off since I know you. What should I tell them?"

c.  On April 7, 2024, while still serving as Empire's counsel, Kass transmitted to Empire a screen capture taken from a mobile phone reflecting an Empire sponsored advertisement appearing in proximity to CarShield in search results and stated, "I think your marketing people are bidding again." Kass did not identify the search query that generated the screen capture, did not identify the campaign or ad group, and did not confirm through objective account records whether any explicit "CarShield" keyword had been purchased or was active.

d. On May 15, 2024, while still serving as Empire's counsel for advertising compliance, Kass wrote to Empire: "Bro, I'm not going to be able to represent you further if you keep buying Carshield. Just a business choice. Empire is still buying it and they are hiring a law firm to sue you if it doesn't come to a permanent end. I can't represent Carshield against you right now but they are livid." Rather than advising Empire solely regarding its legal exposure, Kass conditioned his continued representation on Empire's cessation of conduct adverse to CarShield and framed the issue as a "business choice," thereby aligning his representation decisions with CarShield's commercial interests.

37.     These communications demonstrate that, during the same period in which Defendants were advising Empire concerning advertising compliance and trademark exposure, Kass was simultaneously relaying CarShield's enforcement posture, monitoring Empire's advertising activity, and conditioning his continued representation on Empire's compliance with CarShield's demands. The communications reflect divided loyalty and the subordination of Empire's interests to those of CarShield in connection with the same subject matter.

38.     Sponsored-search advertising platforms distinguish between (i) the keywords an advertiser explicitly selects and bids on and (ii) the consumer search queries ("search terms") on which ads actually serve through platform matching behavior. Regardless of the precise mechanism by which Empire ads served on CarShield-branded searches, competent counsel would have (a) preserved the objective account records to establish exactly how and why ads served, and (b) implemented negative keywords and configuration controls to prevent or materially reduce serving on competitor-branded searches and resulting confusion risk.

39.    Rather than advising Empire how to create a defensive evidentiary record or preserve exculpatory advertising data, Defendants functioned as a conduit for CarShield's enforcement threats. Defendants did not advise Empire to preserve search term reports, bidding logs, campaign configuration data, or other objective materials necessary to defend against a claim of keyword bidding. Nor did Defendants recommend independent analysis of whether Empire's ads were triggered by broad match, dynamic insertion, or non-CarShield queries. Instead, Defendants relayed threats and urged cessation of conduct without building a contemporaneous defensive record.

### Empire's Disclosure of Proprietary Materials and Justifiable Reliance on Defendants' Legal Clearance

40.    Empire retained Defendants specifically to evaluate whether its advertising practices complied with applicable trademark laws and to advise Empire on how to reduce or avoid litigation risk.

41.    Because Empire competes in the same marketplace as CarShield and other providers, Empire sought legal guidance to ensure that its advertising did not infringe the rights of competitors.

42.    The "Advertising Advice" provided by Defendants was not limited to state regulatory consumer-fraud compliance, but encompassed review of Empire's online advertising ecosystem, including sponsored search advertisements, digital ad copy, branding presentation, and internet marketing practices.

43.    Throughout the representation—from March 2023 through May 2025—Empire provided Defendants with unfettered access to its sensitive marketing materials and proprietary digital advertising tools. Empire disclosed these materials to Defendants with the express purpose of having Defendants evaluate the risk of potential trademark claims.

44.     In or about January 2025, Empire provided Kass with copies of multiple internet advertisements and related marketing materials for legal review and approval.

45.     On or about January 15, 2025, Kass provided written approval for Empire's marketing materials, stating: "I have reviewed the attached three internet ads… I believe they are legally compliant and I approve them for use."

46.     Empire reasonably understood this approval to include evaluation of legal exposure arising from the manner in which its online advertising was presented to consumers and competitors in the marketplace.

47.     Empire reasonably relied on these assurances of compliance to its detriment, unaware that its own counsel was simultaneously communicating with a competitor regarding potential enforcement actions arising from these same materials.

48.     Defendants repeatedly advised Empire that its advertising practices were compliant with applicable law and did not present actionable trademark exposure.

49.     At various times during 2024 and 2025, Empire informed Defendants that it was not intentionally purchasing "CarShield" as an operative keyword. Despite this knowledge, Defendants later filed suit on behalf of CarShield alleging such bidding.

50.     If Defendants believed Empire's paid-search advertising created a material risk of trademark infringement, initial interest confusion, or consumer deception—whether through explicit keyword purchases or through ads serving on CarShield-branded searches via other matching behavior—Defendants had a duty to identify the specific risk and recommend concrete remedial steps. Such steps include, without limitation: implementation of robust negative keywords for CarShield and close variants; configuration controls to prevent serving on competitor-branded searches; prominent brand identification and disclaimers in ad copy and

landing pages; call-routing and script disclosures to prevent affiliation confusion; and vendor oversight and record preservation practices customarily employed to reduce confusion risk and litigation exposure in sponsored-search advertising.

51.     Had Defendants advised that Empire's bidding practices or ad structure created a material infringement risk, Empire would have promptly implemented the recommended modifications.

52.     Such modifications were feasible, commercially reasonable, and within Empire's operational control. Implementation of competent risk-mitigation guidance would have materially reduced or avoided the likelihood of litigation by CarShield.

### *The Sham Termination and Continued Entanglement*

53.     On April 15, 2025, just months after giving Empire's marketing materials written "approval for use," Kass sent Empire an email stating that he was terminating representation "effective immediately" and requesting payment of outstanding bills.

54.     The termination occurred only after repeated communications between Defendants and Empire in which Kass discussed CarShield's potential claims against Empire and after Defendants had sought a conflict waiver from Empire in connection with potential adverse representation.

55.     The timing of the termination—immediately preceding the filing of the CarShield Action—demonstrates that the termination was undertaken to facilitate Defendants' representation of CarShield in a matter materially adverse to Empire arising from the same advertising practices.

56.     Despite the April 15, 2025 email purporting to terminate the representation "effective immediately," Defendants continued communicating with Empire regarding legal issues arising from Empire's advertising practices and CarShield's threatened enforcement action. Defendants did not close the file in any meaningful way, did not advise Empire to immediately retain substitute counsel regarding the imminent threat, and continued engaging in discussions concerning the same subject matter on which they had been advising Empire.

57.     Despite the purported April 15 termination, Kass continued communicating with Empire regarding litigation risk arising from its advertising practices, including advising that CarShield had obtained a court order and warning that suit would be filed unless Empire ceased certain conduct. These communications concerned the same advertising practices that formed the basis of the subsequent CarShield Action filed by Defendants on behalf of CarShield.

58.     Specifically, on May 5, 2025, Kass communicated to Empire that CarShield had "obtained this order in court" and had "decided they are going after you for your actual bidding and ads," further stating that unless Empire agreed to stop bidding on the term "CarShield" by the following day, CarShield would file suit. Although Kass stated that he would not represent either side, the substance of the communication conveyed legal risk analysis and suggested a course of action to avoid litigation.

59.     The May 5, 2025 communication went beyond forwarding a threat and included legal risk analysis and proposed courses of action designed to avoid suit, conduct consistent with ongoing legal representation rather than mere ministerial communication.

60.     The May 5, 2025 communication demonstrates that Kass was simultaneously communicating with both Empire and CarShield concerning the same advertising practices and enforcement strategy, acting as an intermediary between the two and attempting to influence

Empire's business conduct in light of CarShield's threatened litigation. This continued entanglement reflects divided loyalty and confirms that the subject matter of the CarShield Action was substantially related to the advertising compliance advice Defendants had provided to Empire.

61.     Defendants' April 15, 2025, purported termination did not constitute an effective disengagement from the "Advertising Advice" representation because Defendants continued to provide communications and guidance concerning CarShield's threatened enforcement action and Empire's advertising practices, and did not provide Empire with a meaningful transition, substitution-of-counsel warning, or other steps consistent with a concluded representation.

62.     Accordingly, at the time Defendants filed the CarShield Action on May 16, 2025, Empire was either still a current client of Defendants within the meaning of Missouri Rule 4-1.7, or, at minimum, a former client within the meaning of Missouri Rule 4-1.9 in a matter that was the same as or substantially related to the "Advertising Advice" engagement.

63.     Under either framework—current client conflict or former client substantial relationship—Defendants were prohibited from undertaking representation materially adverse to Empire without Empire's informed consent confirmed in writing, which Defendants did not obtain.

### *Defendants' Filing of the Adverse CarShield Action*

64.     On May 16, 2025, Defendants filed the CarShield Action in the Eastern District of Missouri on behalf of CarShield against Empire, alleging that Empire's paid-search advertising practices infringed CarShield's trademark rights, caused consumer confusion (including initial interest confusion), and diverted consumers seeking CarShield to Empire.

65.     The claims asserted in the CarShield Action arose out of the same advertising practices, keyword strategies, and compliance issues that Defendants had previously reviewed, analyzed, and advised upon during their representation of Empire.

66.     The CarShield Action and the "Advertising Advice" engagement are substantially related because they involve overlapping facts, the same sponsored search advertising channels, the same keyword bidding practices, the same ad copy and presentation issues, and the same confusion-risk theories that Defendants evaluated, discussed, and "approved" during their representation of Empire.

67.     During the "Advertising Advice" engagement, Empire disclosed confidential and proprietary information to Defendants concerning Empire's marketing structure, advertising configuration, risk posture, compliance considerations, vendor relationships, and internal decision-making regarding digital advertising campaigns, which was not publicly available.

68.     By undertaking representation directly adverse to Empire in a substantially related matter, Defendants placed themselves in a position where the risk of misuse of Empire's confidential information is presumed for purposes of conflict analysis, and Empire was deprived of the protection of loyal, conflict-free counsel.

69.     Upon information and belief, prior to filing the CarShield Action, Kass consulted with DW's internal firm ethics counsel regarding whether he could undertake representation adverse to Empire, demonstrating Defendants' awareness of the significant conflict-of-interest risks presented by such representation.

70.     On May 5, 2025, Kass communicated to Empire that he would not represent either side in a dispute involving Empire and CarShield.

71.     Thereafter, Kass stated in writing that Empire had agreed to "waive any conflict of interest in a case adverse to CarShield involving keyword bidding," and further wrote, "I appreciate it your allowing me to represent CarShield even if it against Empire."

72.     These statements were false. Empire never agreed to any such waiver, never provided written consent to adverse representation, and never communicated any agreement permitting Kass or DW to represent CarShield against Empire. To the contrary, Kass sent multiple communications seeking Empire's agreement to a waiver, which Empire did not provide.

73.     At the time Kass represented to Empire that neither he nor DW would represent CarShield in any dispute adverse to Empire, Defendants were already representing CarShield in other matters and were actively communicating with CarShield concerning potential enforcement action against Empire arising from the same advertising practices Kass had reviewed and "approved" for Empire just months prior.

74.     Upon information and belief, Defendants made these representations while intending to preserve their ongoing relationship with CarShield and while contemplating, or at a minimum remaining willing to undertake, representation of CarShield against Empire if it became strategically or financially advantageous to do so. These statements were therefore false when made, as Defendants did not intend to honor their assurances that they would not represent CarShield in a dispute adverse to Empire.

75.     The burden of identifying, disclosing, and obtaining informed written consent to conflicts of interest rests with the attorney, not the client. That obligation persists through termination of representation and includes continuing duties of loyalty and confidentiality in substantially related matters.

76.     Empire never executed any written conflict waiver consenting to Defendants' representation of CarShield in litigation against Empire.

77.    At no time did Defendants provide Empire with a written disclosure describing the material risks of adverse representation or advising Empire to seek independent counsel regarding such waiver.

78.    Any purported waiver was neither informed nor confirmed in writing as required under applicable professional conduct standards.

79.    The CarShield Action involved allegations concerning Empire's sponsored search advertising, keyword bidding, branding presentation, and consumer confusion risk—the same general category of advertising practices that Defendants had reviewed, analyzed, and advised upon during their representation of Empire.

80.    Under the Missouri Rules of Professional Conduct, including Rules 4-1.7 and 4-1.9, an attorney may not represent a client in a matter directly adverse to a current client, or represent a new client in the same or a substantially related matter adverse to a former client, unless the affected client provides informed consent confirmed in writing. Defendants did not obtain Empire's informed written consent before undertaking representation of CarShield in litigation directly adverse to Empire.

81.    Even before filing suit, Defendants' simultaneous representation of CarShield and Empire created a significant risk that Defendants' advice to Empire regarding advertising practices would be materially limited by Defendants' responsibilities to CarShield, a major client seeking to enforce its trademark rights against Empire.

82.    Even if Defendants contend Empire was a former client when the CarShield Action was filed, the CarShield Action is the same or a substantially related matter because it involves the same online advertising ecosystem, sponsored search practices, ad copy and presentation, keyword bidding strategy, and confusion-risk issues that were the subject of Defendants' engagement to

provide "Advertising Advice." The continued communications between Defendants and Empire concerning CarShield's enforcement posture in May 2025 further demonstrate the substantial relationship and Defendants' ongoing entanglement in the same dispute, regardless of whether Defendants now characterize Empire as a "former" client.

83.     After filing the CarShield Action on behalf of CarShield, Defendants did not immediately withdraw from representing CarShield in the action despite Empire's objection to the conflict of interest.

84.     Once Defendants undertook representation directly adverse to Empire in the same or substantially related matter, they had a duty to withdraw from representation of one or both clients in order to comply with their ethical obligations. Defendants did not timely withdraw from representing CarShield.

85.     As a result, Empire filed a motion seeking Defendants' disqualification from representing CarShield in the CarShield Action.

86.     Defendants subsequently withdrew from representing CarShield in the underlying action. By that time, Defendants had performed billable work on behalf of CarShield in litigation directly adverse to Empire concerning the same subject matter on which Defendants had previously advised Empire.

### Defendants' Misconduct Caused Empire to Suffer Damages

87.     As outlined above and throughout this Amended Complaint, Defendants' conduct described above fell below the standard of care required of attorneys under similar circumstances.

88.     As a direct result of Defendants' conduct, Empire incurred attorneys' fees and costs in seeking Defendants' disqualification from representing CarShield in the CarShield Action and in defending the CarShield Action.

89.    Empire has incurred and continues to incur damages including: (a) fees paid to Defendants for advertising compliance advice; (b) attorneys' fees and litigation expenses incurred in the CarShield Action; and (c) any settlement amounts or judgment entered against Empire in the CarShield Action.

90.    The CarShield Action and the related disqualification proceedings were the natural and proximate consequence of Defendants' conflicted and divided conduct.

91.    CarShield has demanded settlement from Empire in an amount exceeding six figures in connection with the underlying CarShield Action.

92.    In addition, the filing of the CarShield Action alleging deceptive practices caused reputational harm and required Empire to divert time and resources to litigation defense.

93.    Empire's damages were proximately caused by Defendants' acts and omissions, including their provision of allegedly deficient compliance advice, their failure to disclose or properly manage conflicts of interest, and their decision to represent CarShield in litigation directly adverse to Empire concerning the same subject matter.

94.    Defendants' conflicted and divided representation caused incremental harm independent of the underlying trademark dispute, including: (a) loss of the opportunity to mitigate risk before suit was filed; (b) loss of the opportunity to retain conflict-free counsel earlier; (c) exposure to disqualification motion practice that would not have been necessary absent Defendants' switching-sides conduct; and (d) the forfeiture of fees paid for services rendered during the period of undisclosed conflict.

## COUNT I – LEGAL MALPRACTICE

95.    Empire incorporates by reference the preceding paragraphs as though fully set forth herein.

96. An attorney-client relationship existed between Empire and Defendants from March 2023 through May 2025.

97. Defendants' duties arose both from the professional standard of care applicable to Missouri attorneys and from the express and implied contractual commitments reflected in the engagement letter to provide competent "Advertising Advice" and to avoid undisclosed conflicts of interest. By expressly undertaking responsibility for advertising-related legal guidance affecting Empire's business operations, Defendants assumed a duty to provide competent, conflict-free advice concerning trademark exposure, competitor enforcement risk, and litigation avoidance.

98. By virtue of that relationship, Defendants owed Empire duties including: (a) the duty to exercise the degree of skill, care, and diligence ordinarily exercised by reasonably prudent attorneys under similar circumstances; (b) the duty of undivided loyalty and independent professional judgment; (c) the duty to avoid conflicts of interest absent informed written consent; (d) the duty to maintain client confidences; and (e) the duty to provide competent advice concerning reasonably foreseeable litigation risk arising from advertising and trademark practices.

99. Defendants breached those duties in one or more of the following ways:

a. By undertaking representation of CarShield in litigation directly adverse to Empire concerning the same or a substantially related matter without obtaining Empire's informed written consent;

b. By undertaking adverse representation without obtaining informed consent confirmed in writing as required by Rules 4-1.7(b)(4) and/or 4-1.9(a);

c. By allowing their responsibilities to CarShield to materially limit their professional judgment on behalf of Empire while Empire remained a client;

d. By participating in litigation strategy on behalf of CarShield concerning advertising

practices that Defendants had previously reviewed and advised upon for Empire;

e.  By using, or by placing themselves in a position to use, confidential information obtained from Empire—including non-public information concerning Empire's advertising strategies, risk posture, compliance considerations, and marketing structure—in connection with litigation directly adverse to Empire;

f.  By failing to implement reasonable conflict-management procedures before undertaking adverse representation;

g.  By providing legal advice regarding Empire's advertising practices that fell below the standard of care for attorneys advising on trademark compliance and litigation risk; and

h.  By failing to adequately advise Empire of material risks associated with its advertising practices, if such risks existed.

100.    The CarShield Action arose from the same advertising ecosystem, keyword bidding practices, branding presentation, and confusion-risk analysis that formed the subject of Defendants' engagement to provide "Advertising Advice."

101.    The CarShield Action concerns the same Google-sponsored search advertising channels, the same keyword bidding practices, the same ad copy formats, and the same consumer-confusion theories that Defendants reviewed and approved during their representation of Empire. The legal and factual issues overlap in substance, not merely in general subject matter.

102.    Defendants did not obtain Empire's informed consent confirmed in writing before undertaking representation adverse to Empire, as required under applicable professional standards.

103.    Defendants did not provide Empire with any written disclosure describing the material risks and reasonably foreseeable adverse consequences of Defendants' adverse

representation, and did not advise Empire to seek independent counsel regarding any purported waiver.

104.	As outlined in detail throughout this Amended Complaint, Defendants failed to use such skill, prudence, and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in performance of tasks which they undertake, resulting in damages to Empire.

105.	But for Defendants' breaches: (a) Empire would have modified its advertising practices to avoid material infringement risk; (b) Empire would not have disclosed proprietary advertising strategies to conflicted counsel; (c) Empire would not have been subjected to litigation brought by its former counsel in a substantially related matter; and (d) Empire would not have incurred the resulting litigation costs, disqualification expenses, settlement exposure, and related damages.

106.	But for Defendants' conflicted and deficient representation, Empire would have obtained a materially better outcome with respect to the CarShield dispute. Specifically, conflict-free counsel exercising independent professional judgment would have advised Empire to implement concrete and commercially reasonable risk-mitigation measures (including the use of negative keywords, campaign configuration controls, and ad copy/presentation adjustments) and to preserve objective advertising records, which would have prevented the filing of the CarShield Action and/or materially reduced Empire's exposure in that litigation.

107.	These mitigation and preservation steps are routine in sponsored-search trademark risk management. Implemented promptly, they would have materially reduced the likelihood of the CarShield Action being filed, and/or materially narrowed the scope of claims, discovery burdens, and settlement leverage asserted against Empire, including the "diversion funnel" theories now advanced in the CarShield pleadings.

108.    Defendants' breaches were a substantial factor in causing Empire to incur attorneys' fees and costs in the CarShield Action, to face settlement and judgment exposure, and to suffer the other damages alleged herein; those harms were reasonably foreseeable consequences of Defendants' failure to provide conflict-free, competent advertising counsel under the engagement.

109.    As a direct and proximate result of these breaches, Empire incurred damages, including but not limited to (a) fees paid to Defendants for conflicted and deficient advice, (b) attorneys' fees and litigation expenses incurred in seeking Defendants' disqualification from representing CarShield in the CarShield Action and in defending the CarShield Action, (c) any settlement amounts or judgment entered in that litigation, and (d) consequential damages arising from business disruption and reputational harm.

110.    Defendants' conduct in representing directly adverse interests in the same or a substantially related matter without informed written consent was knowing and intentional and demonstrated conscious disregard for Empire's rights.

111.    As a result, Empire is entitled to recover compensatory and consequential damages and, to the extent permitted by law, punitive damages.

**<u>COUNT II – BREACH OF A FIDUCIARY DUTY/CONSTRUCTIVE FRAUD</u>**
(In the alternative to Count I, and to the extent Defendants' conduct is not found to constitute professional negligence)

112.    Empire incorporates the preceding paragraphs as though fully set forth herein.

113.    An attorney-client relationship existed between Empire and Defendants from March 2023 through May 2025.

114.    As Empire's attorneys, Defendants owed Empire fiduciary duties, including the duty of undivided loyalty, the duty to exercise independent professional judgment, the duty to

avoid representing directly adverse interests in the same or substantially related matters absent informed written consent, and the duty not to use client confidences to the client's disadvantage.

115.    Defendants' duties of loyalty, independent professional judgment, and avoidance of conflicts of interest—reflected in Missouri Rules of Professional Conduct 4-1.7 and 4-1.9—prohibited representation directly adverse to Empire in the same or a substantially related matter absent Empire's informed consent, confirmed in writing, which was never obtained.

116.    By undertaking representation of CarShield in litigation involving the same online advertising ecosystem previously reviewed for Empire, Defendants placed themselves in a position where the risk of misuse of Empire's confidential information is presumed for purposes of conflict analysis.

117.    Defendants also owed Empire a fiduciary duty to maintain the confidentiality of information obtained during the course of representation and not to use such information to Empire's disadvantage.

118.    Defendants breached their fiduciary duties by undertaking representation of CarShield in litigation directly adverse to Empire concerning the same advertising practices on which Defendants had previously advised Empire, without obtaining Empire's informed written consent.

119.    By representing CarShield in litigation against Empire involving the same subject matter, Defendants placed themselves in a position of divided loyalty and impaired their ability to exercise independent professional judgment on Empire's behalf.

120.    Defendants' divided loyalties materially limited their representation of Empire and created a conflict of interest prohibited by applicable professional standards.

121.    The breach of fiduciary duty alleged herein is independent of any failure to meet

the technical standard of care for legal advice. Even if Defendants' advertising advice were deemed non-negligent, Defendants violated the separate and independent duty of loyalty by representing materially adverse interests in a substantially related matter without informed consent.

122.    As a result of Defendants' fiduciary breaches, Empire was exposed to litigation by a former counsel possessing knowledge of Empire's advertising practices and strategies.

123.    Upon information and belief, Defendants used or disclosed information obtained during their representation of Empire in connection with the CarShield Action.

124.    The use or potential use of such information in litigation directly adverse to Empire constitutes a breach of Defendants' fiduciary duties of loyalty and confidentiality.

125.    Defendants' fiduciary breaches deprived Empire of the undivided loyalty to which it was entitled and undermined the trust inherent in the attorney-client relationship.

126.    As a direct and proximate result of these breaches, Empire incurred damages, including but not limited to (a) fees paid to Defendants for conflicted and deficient advice, (b) attorneys' fees and litigation expenses incurred in seeking Defendants' disqualification from representing CarShield in the CarShield Action and in defending the CarShield Action, (c) any settlement amounts or judgment entered in that litigation, and (d) consequential damages arising from business disruption and reputational harm.

127.    Because Defendants breached their fiduciary duties of loyalty in connection with matters undertaken pursuant to the written engagement for "Advertising Advice," Empire is entitled to equitable relief, including forfeiture and disgorgement of fees paid under that engagement during the period in which the conflict of interest existed, regardless of proof of additional damages.

128.    Defendants' decision to represent directly adverse interests in the same subject

matter without informed written consent was knowing and intentional and demonstrated conscious disregard of Empire's rights, warranting punitive damages to the extent permitted by law.

129.    Accordingly, Empire seeks compensatory and consequential damages, fee disgorgement, punitive damages as permitted by law, and such other relief as the Court deems just and proper.

## COUNT III – FRAUDULENT MISREPRESENTATION

130.    Empire incorporates the preceding paragraphs as though fully set forth herein.

131.    The fraudulent misrepresentations alleged herein concern statements of present fact and present intent regarding Defendants' conflict status, ethical posture, and willingness/ability to represent interests adverse to Empire, and were made to induce continued reliance and disclosure of confidential information.

132.    These misrepresentations are independent of, and not merely restatements of, any claim that Defendants negligently provided legal advice; they concern deception regarding loyalty, conflicts, and Defendants' intent and ability to act adverse to Empire.

*False Statements of Present Fact and Present Intent*

133.    During the course of their representation of Empire from 2023 through 2025, Defendants, including Kass acting on behalf of DW, made specific representations of present fact and present intent to Empire, including that: (a) Empire's advertising practices and materials had been reviewed and were legally compliant and did not expose Empire to actionable trademark claims by CarShield; and (b) Defendants could not and would not represent CarShield in any dispute adverse to Empire concerning those same advertising practices. These representations were made in the context of an ongoing written engagement pursuant to which Defendants had expressly agreed to provide "Advertising Advice" affecting Empire's business operations and had positioned

themselves as Empire's trusted and conflict-free advisors.

134.    On January 24, 2024, Kass stated in writing to Empire that he "can't represent either of you in a dispute" concerning CarShield and Empire.

135.    On May 15, 2024, Kass again stated in writing to Empire that he "can't represent CarShield against you."

136.    On May 5, 2025, Kass stated in writing that he "would not represent either side" in a dispute involving Empire and CarShield.

*Falsity and Scienter at the Time the Statements Were Made*

137.    At the time each of these representations was made, Defendants knew the representations were false or made them with reckless disregard for their truth because Defendants were then representing CarShield in other matters and were contemporaneously communicating with CarShield regarding enforcement strategy directed at Empire concerning the same advertising practices Defendants had reviewed and "approved" for Empire.

138.    At the time Defendants represented that Empire's advertising practices were compliant and non-actionable, Defendants had already received and relayed complaints from CarShield concerning Empire's keyword bidding and sponsored advertising, were monitoring Empire's advertising activity on CarShield's behalf, and were warning Empire that CarShield was preparing to pursue enforcement—facts inconsistent with Defendants' assurances of non-actionable exposure.

139.    Upon information and belief, and based on the timing and content of Defendants' communications with both Empire and CarShield, Defendants had consulted internally regarding conflicts and the feasibility of undertaking adverse representation and had not foreclosed the possibility of representing CarShield against Empire when they assured Empire that they could not

and would not do so.

140.    The representations that Defendants "could not" or "would not" represent CarShield against Empire were statements of present intent and present ethical posture that were false when made because Defendants intended to preserve their ability to undertake adverse representation if it became strategically or financially advantageous, and in fact did so shortly thereafter.

*Materiality, Intent to Induce Reliance, and Reliance*

141.    Defendants made the foregoing misrepresentations with the intent to induce Empire to continue relying on Defendants for advertising-compliance advice, to continue disclosing confidential and proprietary advertising strategies and materials, and to refrain from seeking independent counsel concerning conflicts and litigation risk.

142.    The misrepresentations were material to Empire's decisions to: (a) continue its advertising practices in reliance on Defendants' clearance and approval; (b) continue providing Defendants with non-public, proprietary information concerning its advertising ecosystem and risk posture; and (c) continue the attorney-client relationship with Defendants despite the known competitive relationship between Empire and CarShield.

143.    Empire reasonably relied on Defendants' misrepresentations because Defendants were Empire's counsel, occupied a position of trust and superior knowledge regarding trademark risk and conflicts of interest, and affirmatively held themselves out as competent and conflict-free advisors on the very subject matter later used against Empire.

*Causation and Damages*

144.    But for Defendants' misrepresentations, Empire would have materially modified or suspended the identified advertising practices, sought independent counsel regarding conflicts and

litigation risk, and limited or withheld disclosure of confidential advertising strategies and materials.

145.    As a direct and proximate result of Defendants' misrepresentations and Empire's reliance thereon, Empire suffered damages, including: (a) fees paid to Defendants for conflicted and misleading advice; (b) attorneys' fees and costs incurred in seeking Defendants' disqualification and withdrawal in the CarShield Action; (c) attorneys' fees and costs incurred in defending the CarShield Action; and (d) settlement amounts or judgments entered in that action, together with consequential damages arising from reputational harm and business disruption.

*Intentional or Reckless Conduct; Punitive Damages*

146.    Defendants' misrepresentations were made knowingly or with reckless indifference to their truth, and as part of a course of conduct designed to preserve Defendants' relationships with both clients while positioning Defendants to undertake adverse representation.

147.    Defendants' conduct was willful, malicious, and in conscious disregard of Empire's rights, entitling Empire to compensatory and consequential damages and, to the extent permitted by law, punitive damages.

## COUNT IV – NEGLIGENT MISREPRESENTATION
(In the alternative to Count III)

148.    Empire incorporates the preceding paragraphs as though fully set forth herein.

149.     In the course of Defendants' business and profession as attorneys providing "Advertising Advice" to Empire, Defendants supplied information to Empire for the guidance of Empire in its business and marketing operations, including information concerning: (a) whether Empire's identified advertising practices and materials were legally compliant and exposed Empire to actionable trademark claims, including by CarShield; and (b) whether Defendants

could or would represent CarShield in any dispute adverse to Empire concerning those same advertising practices.

150. Defendants failed to exercise reasonable care or competence in obtaining or communicating this information to Empire, including by: (a) failing to conduct a reasonable investigation into trademark infringement and confusion risk associated with Empire's sponsored search advertising and keyword strategies; (b) failing to competently analyze and communicate the litigation risk posed by competitors' enforcement practices, including CarShield's known enforcement posture; (c) failing to implement and follow reasonable conflict-checking and risk-management procedures before assuring Empire that Defendants could not or would not undertake adverse representation; and (d) providing assurances of compliance and conflict-free status without a reasonable factual or professional basis.

151. Empire justifiably relied on Defendants' negligent misrepresentations in continuing its advertising practices, in continuing to disclose confidential and proprietary advertising strategies and materials to Defendants, and in foregoing consultation with independent counsel regarding conflicts and litigation risk.

152. These misrepresentations are independent of, and not merely restatements of, any claim that Defendants negligently provided legal advice; they concern deception regarding loyalty, conflicts, and Defendants' intent and ability to act adverse to Empire.

153. This Count seeks recovery for economic loss caused by Defendants' negligent provision of information for Empire's business and marketing decision-making, independent of any alleged litigation conduct, trial strategy, or courtroom advocacy.

154. But for Defendants' negligent misrepresentations, Empire would have materially modified or suspended the identified advertising practices, sought independent legal advice

concerning trademark exposure and conflicts of interest, and limited or withheld disclosure of confidential information.

155.    As a direct and proximate result of Defendants' negligent misrepresentations and Empire's reliance thereon, Empire suffered pecuniary loss, including: (a) fees paid to Defendants for deficient advice; (b) attorneys' fees and litigation expenses incurred in seeking Defendants' disqualification and in defending the CarShield Action; and (c) any settlement amounts or judgment entered in that action, together with consequential damages arising from business disruption and reputational harm.

### COUNT V – NEGLIGENT SUPERVISION
(Against Dickinson Wright PLLC, Only)

156.    Empire incorporates the preceding paragraphs as though fully set forth herein.

157.    At all relevant times, Defendant Kass was a partner, member, or employee of DW and was acting within the course and scope of his employment and agency with DW in providing legal services to Empire and in undertaking representation of CarShield.

158.    DW owed a duty to Empire to exercise reasonable care in supervising its attorneys, including Kass, and in implementing, maintaining, and enforcing reasonable policies and procedures concerning conflicts of interest, client intake, conflict checks, ethical screening, and risk management.

159.    DW had a duty to ensure that its attorneys did not undertake representation directly adverse to a current client, or in the same or a substantially related matter adverse to a former client, without obtaining informed written consent.

160.    DW breached its duties by: (a) failing to implement or enforce adequate conflict-checking systems capable of identifying concurrent or successive conflicts involving competitors in trademark-sensitive matters; (b) failing to require written documentation of conflict

disclosures and informed written consent before permitting adverse representation; (c) failing to adequately train and supervise Kass regarding conflict management, ethical screens, and duties of loyalty to existing clients; and (d) permitting Kass to consult internal ethics counsel regarding adverse representation but failing to ensure that any adverse representation was conditioned on compliance with conflict rules, including written informed consent.

161.   DW knew or reasonably should have known that Kass had represented, or was representing, both Empire and CarShield during overlapping time periods in trademark-sensitive matters involving competitors in the same market, creating a foreseeable risk of divided loyalty and misuse of client confidences.

162.    DW's supervisory failures were a substantial factor in causing Kass to undertake representation directly adverse to Empire in the same or a substantially related matter, to make misleading conflict-related assurances to Empire, and to proceed with conflicted representation without obtaining informed written consent.

163.   As a direct and proximate result of DW's negligent supervision, Kass undertook representation of CarShield in litigation directly adverse to Empire and Empire suffered damages, including but not limited to: (a) fees paid to Defendants for conflicted or deficient advice; (b) attorneys' fees and litigation expenses incurred in seeking Defendants' disqualification and in defending the CarShield Action; and (c) any settlement amounts or judgment entered in that action, together with consequential damages arising from business disruption and reputational harm

164.   DW's failure to implement and enforce adequate supervisory, training, and conflict-management procedures fell below the standard of care applicable to a professional law firm under similar circumstances.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Empire Auto Protect, LLC respectfully requests that judgment be entered in its favor and against Defendants Jeffrey H. Kass and Dickinson Wright PLLC, and that the Court award the following relief:

A. Compensatory damages in an amount to be determined at trial for all losses proximately caused by Defendants' misconduct, including but not limited to: (i) fees paid to Defendants for deficient or conflicted advice, (ii) attorneys' fees and costs incurred in seeking Defendants' disqualification in the CarShield Action,  (iii) attorneys' fees and litigation expenses incurred in defending the CarShield Action, and (iv) any settlement amounts or judgment entered against Empire in the CarShield Action;

B. Consequential and special damages arising from business disruption, reputational harm, and diversion of resources, in an amount to be proven at trial;

C. Disgorgement and forfeiture of all fees, costs, and other compensation received by Defendants during the period in which Defendants labored under undisclosed and unwaived conflicts of interest, as an equitable remedy for breach of fiduciary duty, regardless of proof of additional damages;

D. Punitive damages, to the extent permitted by law, based on Defendants' knowing, intentional, and conscious disregard of Empire's rights;

E. Pre-judgment and post-judgment interest on all recoverable sums, as allowed by law;

F. Costs of suit and all allowable litigation expenses incurred by Empire in this action;

G. Such equitable relief as the Court deems just and proper to remedy Defendants' breach of fiduciary duty and misconduct; and

H. Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiff respectfully demands a trial by jury on all issues properly triable before a jury in this action.

Respectfully submitted,

Date:   March 6, 2026

/s/ Dmitry Lapin
Dmitry Lapin, Esq.
Axenfeld Law Group, LLC
2001 Market Street Suite 2500
Philadelphia, PA 19103
dmitry@axenfeldlaw.com
917-979-4570

*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned certifies that on March 6, 2026, the foregoing document was filed with the Clerk of the Court to be served via the Court's electronic filing system upon all counsel of record.

/s/ Dmitry Lapin
Dmitry Lapin